**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| **FRANK PRECKEL**<br>7943 Parke West Drive<br>Glen Burnie, Maryland 21061<br><br>      Plaintiff,<br>v.<br><br>**UNIVERSITY OF MARYLAND, BALTIMORE**<br>620 West Lexington Street<br>Baltimore, Maryland 21201,<br><br>    Serve:<br>    Hon. Brian E. Frosh<br>    200 St. Paul Place<br>    Baltimore, Maryland 21202<br><br>**THE BOARD OF REGENTS OF THE**<br>**UNIVERSITY SYSTEM OF MARYLAND**,<br>3300 Metzerott Road<br>Adelphi, MD 20783<br><br>    Serve:<br>    Hon. Brian E. Frosh<br>    200 St. Paul Place<br>    Baltimore, Maryland 21202<br><br>      Defendants. | Civil Action File No.:<br>(Jury Trial Demanded) |

## COMPLAINT

Plaintiff, Frank Preckel ("Dr. Preckel" or "Plaintiff"), by and through his undersigned counsel, brings this Complaint against University of Maryland Baltimore ("UMB" or "Defendant") and the Board of Regents of the University System of Maryland ("Board of Regents") (collectively "UMB") by averring as follows:

## INTRODUCTION

1. This is an action brought by a current employee of UMB for discrimination in employment based on race, color, age, gender, and retaliation due to UMB's actions and inaction.

2. Dr. Preckel's claims are brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and the Age Discrimination Employment Act of 1967, 29 U.S.C. § 633a, *et seq*., as amended ("ADEA"), addressing age discrimination and retaliation in the terms and conditions of employment. This action also seeks relief pursuant to 42 U.S.C. § 2000e- 3(a), as amended, which prohibits retaliation against an employee for pursuing protected rights.

3. These claims, supporting facts, and damages set forth in this action are referred to individually or, at times, collectively as the "Lawsuit."

## PARTIES

4. Dr. Preckel is a white/Caucasian male employee over forty-years of age and is a resident of the State of Maryland and at all times relevant to this lawsuit, Dr. Preckel was an employee of Defendant within the meaning of Title VII and the ADEA.

5. Defendant, University of Maryland Baltimore, is an employer within the meaning of Title VII and the ADEA, and who, at all times relevant to this lawsuit, employed fifteen or more employees.

6. The Board of Regents of the University System of Maryland is the governing body over the University System of Maryland, including UMB.

## SUBJECT MATTER JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(3).

8. Venue is proper in the District of Maryland under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) as Defendant is located in and Plaintiff works in Baltimore, Maryland.

## ADMINISTRATIVE UNDERTAKINGS

9. Dr. Preckel filed an Equal Employment Opportunity Complaint deemed filed on May 3, 2019. The Equal Employment Opportunity Commission issued an EEOC Dismissal and Notice of Right via regular U.S. Mail dated September 24, 2020, which was received on September 28, 2020 and which provided Dr. Preckel his right to file the instant action within ninety (90) days of receipt of the Notice. The instant lawsuit has been filed within 90 days of his receipt of the Notice of Rights.

## FACTS

10. Dr. Preckel began his employment with Defendant UMB in October, 2011 as a systems administrator.

11. On May 1, 2019, Dr. Preckel filed a discrimination complaint with the Office for Civil Rights, U.S. Department of Education ("DoEd") addressing age, gender and color/race discrimination and retaliation he experienced by UMB police officers, administrators, and employees.

12. DoEd referred the complaint to the EEOC on July 23, 2019 and it was assigned an EEOC Claim No. 531-2019-03173N.

13. Dr. Preckel's EEO Complaint identified several instances of discriminatory and retaliatory conduct giving rise to his EEO Complaint, including disparate treatment in handling complaints, harassment due having made a complaint, singling out, negative entry in his employment record, disparaging information shared with UMB employees, hyper-scrutiny in his

2

work, ongoing harassment, failing to investigate his complaints and refusal to provide him information pertaining to the investigation.

14.     On March 18, 2017, Dr. Preckel reported, in writing, to the Chief of UMB's Police, which he copied to the President of UMB, that he had been accosted twice by different unknown black females at the intersection of Martin Luther King Boulevard ("MLK Boulevard") and West Pratt Street, Baltimore, Maryland, on his way to work.  The incidents included threats against Dr. Preckel about his race and gender. Dr. Preckel was concerned about his security and being a target due to his race/color and gender.

15.     The only response that Dr. Preckel received was from Antonio Williams ("Mr. Williams")(Black male), from the UMB Police and Safety Division, stating that there was nothing that could be done because that location is the jurisdiction of the Baltimore City Police.

16.     On February 13, 2019, after parking his vehicle and crossing MLK Boulevard, Dr. Preckel was walking east on West Pratt Street, Baltimore to get to work at UMB.  An adult black, female, younger than forty-years of age, appeared from behind the UMB directory sign and began to rant racial slurs at Dr. Preckel and remained alongside him as he walked up the street.  She was agitated and angry.  As she followed him, she yelled at him calling him "white trash," "privileged ass," "pig skin puckered head," and other outrageous names.  She also told him, "I know where you live."

17.     Though Dr. Preckel had been the target of racial slurs during his walk into work, this attack was particularly outlandish and threatening.  Dr. Preckel attempted to avoid her barrage of insults and continued to walk down West Pratt St. with his eyes cast downward and keeping quiet, to not escalate the situation.  All the while the female followed beside him and continued to yell at him, her arms gesticulating.

3

18.     When Dr. Preckel approached the UMB garage he took advantage of the opportunity to escape her.  He stopped, took a step back and swiftly crossed behind this female and entered the garage seeking an alternate route to work.

19.     The female, noting Dr. Preckel had made his escape from her, called upon two adult black males to go after Dr. Preckel.  These 2 black males ran after Dr. Preckel and confronted him in the UMB garage, threatening to "f*ck him up."  At that point, Dr. Preckel called out to two UMB parking attendants (black) who were within twelve feet of where he was being confronted and I asked them to call the police.  They looked at Dr. Preckel, noted the two black males confronting him and did nothing in response to Dr. Preckel's call for help.

20.     However, after the 2 black males noticed they were being observed, they backupped and exited the garage.

21.     Dr. Preckel continued through the garage, exiting on Pennsylvania Street and immediately went over to the UMB police office who was in a UMB police vehicle, parked on the corner of Pennsylvania St. and Lemmon St.  Dr. Preckel informed the officer that he was being threatened by a "short-younger African-American woman," and that he wanted to get away from her.  Dr. Preckel also mentioned that he believed this black female was exhibiting dangerous and irrational behavior.  The officer he spoke with was Officer Joseph Fair ("Officer Fair").  Officer Fair's reaction to Dr. Preckel's complaint was one of disdain and incredulity.  Officer Fair did not seem interested and failed to ask any additional questions.

22.     Officer Fair did not investigate Dr. Preckel's complaint.  Instead, he used it to cast Dr. Preckel as a racist and misogynist, because Dr. Preckel had deigned to complain about a younger black female.

4

23. Later that day, after Dr. Preckel had initially spoken to Officer Fair, the female who threatened Dr. Preckel contacted Officer Fair. Officer Fair met with her and spoke to her. Not coincidentally, the next day, she filed a complaint with UMB's Office of Accountability and Compliance ("OAC").

24. The female is identified by Defendant UMB as "A.W." and, at that time, she was an employee of UMB.

25. Unlike with Dr. Preckel's complaint, when A.W. contacted Officer Fair, he took the time to meet with her and to do an initial investigation into A.W."s complaint. Upon information and belief, he encouraged her to file a complaint with OAC. Office Fair went so far as to seek out Dr. Preckel's gold Saturn, which was parked several blocks off the UMB campus, look up his license plate and identify him. He then shared his findings with A.W. who then filed the complaint with OAC.

26. It appears that A.W. was angry at Dr. Preckel for attempting to park in the same location she was trying to park. A.W. noted Dr. Preckel and his car model and color. A.W. then monitored where Dr. Preckel parked and waited for him as he walked from his vehicle to work and that is where she ambushed him.

27. A.W.'s complaint alleged that it was Dr. Preckel who called her racist names and was following her. In addition, A.W. described that she come across two co-workers and shared with that Dr. Preckel had been following her and had gone into the UMB garage.

28. In response to A.W.'s complaint, UMB police and OAC pulled videos and, presumably, watched them. In one video it clearly indicates that A.W. is the aggressor. It is A.W. who can be seen trying to keep up with Dr. Preckel and her mouth is moving, and her arms gesturing forcefully. The video shows Dr. Preckel with his head down and straight ahead,

walking without speaking and in no way engaging with A.W. This same video shows A.W. make her way towards two black adult males and speak rapidly at them and point towards the garage. These two black adult males quickly make their way into the garage. This indicated that A.W. did not just pass these two males but, rather, sought them out. It also indicates that these two males reacted to A.W.'s statements and demands. Yet, there are no statements from these two males, even though they were A.W.'s co-employees.

29. After A.W. complained, UMB OAC demanded that Dr. Preckel meet with them to interview him about A.W.'s complaint. After dealing with the logistics of the meeting, Dr. Preckel met with UMB OAC. During the meeting OAC peppered Dr. Preckel with questions but refused to address Dr. Preckel's concerns about A.W.'s assault.

30. UMB OAC's questions relied on incorrect facts, assumed that A.W. was telling the truth and that Dr. Preckel was lying.

31. For instance, UMB concluded that because A.W. was shorter and smaller than Dr. Preckel, that she could not be an aggressor, that she could not be threatening, and that she had not verbally attacked Dr. Preckel.

32. UMB believed that Dr. Preckel made racial statements to A.W. but disbelieved Dr. Preckel when he informed them that A.W. had made racist statements to him. As such UMB decided that the black female was more credible than the older white male, even though at least one video belied that conclusion. The bias reflected in UMB's investigation was that Dr. Preckel, an older white male, must be the one who made the racist statements.

33. UMB ignored the facts that showed A.W. had encouraged and directed the 2 black males to go after Dr. Preckel, readily ascertained by watching at least one video, and failed to address the inconsistencies in A.W.'s so-called factual account.

34. UMB failed to interview pertinent witnesses, including the 2 adult black males who ran into the garage after Dr. Preckel.

35. UMB mischaracterized the factual record and ignored facts to find that Dr. Preckel was the one at fault. It also believed A.W. over Dr. Preckel even though A.W.'s account was not supported by the videos.

36. UMB stated A.W.s statements as fact and did not test them. For instance, UMB stated that "A.W. exited her vehicle and began walking to work along Pratt Street across Martin Luther King Jr. Boulevard." Yet, there would be no way to corroborate this in that there is no video of this. UMB accepted A.W.'s statement that Dr. Preckel was walking behind her. However, Dr. Preckel was approaching UMB from a different direction than where A.W. was parked. This means that at the point A.W. popped out from behind the UMB directory, she either made it to that area right as Dr. Preckel had crossed the street and it was coincidence that she was there exactly at the moment, or she was waiting to see if he would come by.

37. UMB was so keen on finding Dr. Preckel at fault that they even cast his out of the ordinary behavior as being nefarious. For instance, the fact that Dr. Preckel prepared a statement to read to UMB was deemed problematic and when Dr. Preckel would not simply give his statement over to UMB, it found fault in him. UMB went so far as to fault him for being nervous and agitated as they were grilling him.

38. UMB's interview of Dr. Preckel was not meant to elicit information but to attempt to corner and accuse Dr. Preckel.

39. UMB asked inartful and imprecise questions and then found fault in Dr. Preckel's attempts to answer them specifically. For instance, one question they asked was regarding Dr. Preckel's car, a Saturn. Yet, because Dr. Preckel owns more than one Saturn, the way they asked

it, he could not answer it as they expected. They concluded he was being evasive but failed to consider that the questions presented were vague and imprecise.

40. UMB ignored evidence that corroborated Dr. Preckel's version of what occurred because the investigation was not to unearth facts and to analyze them impartially. Rather it was to achieve the result of finding that Dr. Preckel violated UMB's non-discrimination policy. UMB perceived Dr. Preckel as someone who is part of the race problem – the quintessential white privileged male. Whereas UMB viewed A.W. as the victim of discrimination, simply because of the color of her skin, her race, and her gender.

41. UMB investigators accused Dr. Preckel of not cooperating with the investigation even though he had been cooperative and had followed up to their requests to speak with him. UMB investigators went so far as to threaten Dr. Preckel that they would inform his supervisor that he was not being cooperative.

42. UMB concluded that Dr. Preckel had engaged in the conduct alleged by A.W., that he was in violation of the UMB's non-discrimination policy and UMB recommended further disciplinary action.

43. The negative finding – that Dr. Preckel made the racist remarks as alleged by A.W., that he was evasive and uncooperative – all remain in his employment record.

44. After the so-called investigation had concluded, Office Fair kept Dr. Preckel in his cross hairs. Officer Fair issued Dr. Preckel a parking warning on April 30, 2019, though Dr. Preckel was performing his assigned duties and picking up computer system backup tapes for delivery off-site and had a sign on his windshield stating, "Vehicle Temporarily Parked for logistic support for the Center for Information Technology Service (CITS)," and provided a contact number.

45. Subsequently, on May 3, 2019, Officer Fair intercepted a City of Baltimore Police Officer responding to Dr. Preckel's call from the UMB parking lot after Dr. Preckel reported an assault and property damage.  Another UMB officer (black) arrived and instead of assisting Dr. Preckel, he became combative towards Dr. Preckel, as if Dr. Preckel was the suspect.

46. UMB's failure to investigate Dr. Preckel's concerns, its bias against Dr. Preckel in its investigation of A.W.'s complaints, its mischaracterization of the facts and evidence, its intent to find Dr. Preckel at fault, its imposition of a negative finding and placing it in his employment records, its sharing of negative information with UMB employees, and its ongoing efforts to monitor Dr. Preckel, caused Dr. Preckel great concern, anxiety, fear and reputational harm.

47. Dr. Preckel wanted to obtain the information surrounding the so-called investigation into his conduct and submitted several Public Information Act requests to UMB in mid-2019 for the information, which were denied.

48. There was no reason to deny his PIA requests, other than to keep him from information that he needed.  Dr. Preckel has since received much of the requested information after his counsel submitted a second set of PIA requests in early 2020, re-requesting the information.

49. The information confirms Dr. Preckel's claims that UMB police, OAC, and other UMB employees were making negative comments about Dr. Preckel and damaging his reputation.  Dr. Preckel lives with the knowledge that many UMB employees were part of a disparaging rumor mill about Dr. Preckel.  In addition to the negative finding in his employment records, Dr. Preckel works under a cloud created by UMB.

## COUNT I
## RACE AND COLOR DISCRIMINATION

9

## TITLE VII

50. Dr. Preckel incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

51. At all times relevant to this Complaint, Dr. Preckel was a white/Caucasian "employee" and Defendants were "employers" within the meaning of Title VII.

52. Defendants took an adverse action against Dr. Preckel when they conducted a biased and tainted investigation, failed to investigate A.W.'s conduct, concluded Dr. Preckel violated the non-discrimination policy, placed this critically negative finding in his employment records, shared the negative finding with his supervisors and disparaged Dr. Preckel reputation.

53. The conduct as alleged throughout this Complaint constitutes discrimination and disparate treatment based on race/color in violation of Title VII.

WHEREFORE, Dr. Preckel demands judgment against Defendant and seeks the following relief:

a. Compensatory damages;

b. Attorney's fees and costs;

c. Injunctive relief;

d. Other equitable relief; and

e. Any other relief authorized and that this Court deems just and equitable.

something

## COUNT II
## GENDER DISCRIMINATION
## TITLE VII

54. Dr. Preckel incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

55. At all times relevant to this Complaint, Dr. Preckel was a male "employee" and Defendants were an "employer" within the meaning of Title VII.

56. Defendants took an adverse action against Dr. Preckel when they conducted a biased and tainted investigation, failed to investigate A.W.'s conduct, concluded Dr. Preckel violated the non-discrimination policy, placed this critically negative finding in his employment records, shared the negative finding with his supervisors and disparaged Dr. Preckel reputation.

57. The conduct as alleged throughout this Complaint constitutes discrimination and disparate treatment based on gender in violation of Title VII.

WHEREFORE, Dr. Preckel demands judgment against Defendant and seeks the following relief:

    a. Compensatory damages;

    b. Attorney fees and costs;

    c. Injunctive relief;

    d. Other equitable relief; and

    e. Any other relief authorized and that this Court deems just and equitable.

## COUNT III
## AGE DISCRIMINATION
## ADEA

58. Dr. Preckel incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

59. At all times relevant to this Complaint, Dr. Preckel was an "employee" over the age of forty and Defendants were an "employer" within the meaning of the ADEA.

60. Defendants took an adverse action against Dr. Preckel when they conducted a biased and tainted investigation, failed to investigate A.W.'s conduct, concluded Dr. Preckel

violated the non-discrimination policy, placed this critically negative finding in his employment records, shared the negative finding with his supervisors and disparaged Dr. Preckel reputation.

61. The conduct as alleged throughout this Complaint constitutes discrimination and disparate treatment based on age in violation of the ADEA.

WHEREFORE, Dr. Preckel demands judgment against Defendant and seeks the following relief:

a. Compensatory damages;

b. Attorney's fees and costs;

c. Injunctive relief;

d. Other equitable relief; and

e. Any other relief authorized and that this Court deems just and equitable.

## COUNT IV
## RETALIATION
## ADEA and TITLE VII

62. Dr. Preckel incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

63. At all times relevant to this Complaint, Dr. Preckel was a male "employee" over the age of forty and Defendants were an "employer" within the meaning of Title VII and the ADEA.

64. Defendants retaliated against Dr. Preckel when they failed to investigate Dr. Preckel's complaints race, gender, and age discrimination and, instead, retaliated against him for having brought concerns forward about A.W., a black/African American adult female who is younger than forty years of age.

65. The conduct as alleged throughout this Complaint constitutes retaliation based on Title VII and the ADEA.

WHEREFORE, Dr. Preckel demands judgment against Defendant and seeks the following relief:

   a. Compensatory damages;

   b. Attorney's fees and costs;

   c. Injunctive relief;

   d. Other equitable relief; and

   e. Any other relief authorized and that is Court deems just and equitable.

### COUNT V
### HOSTILE WORK ENVIRONMENT
### TITLE VII and ADEA

66. Dr. Preckel incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

67. At all times relevant to this Complaint, Dr. Preckel was a white/Caucasian male "employee" over the age of forty and Defendants were an "employer" within the meaning of Title VII and the ADEA.

68. Dr. Preckel was subjected to continuous and pervasive mistreatment after he complained about A.W. and after A.W. brought fraudulent complaints against Dr. Preckel. This conduct was intense and lasted throughout the so-called investigation and beyond. It included continual demands from Dr. Preckel, accusations and questioning, singling out and other actions as alleged in the Complaint. Management was part of the harassing conduct and did nothing to stop the conduct, even after Dr. Preckel made clear that he was being treated poorly because he is an older white/Caucasian/male and A.W. is a younger black.

69. The conduct as alleged throughout this Complaint created a hostile work environment under Title VII and the ADEA.

WHEREFORE, Dr. Preckel demands judgment against Defendant and seeks the following relief:

    a. Compensatory damages;

    b. Attorney's fees and costs;

    c. Injunctive relief;

    d. Other equitable relief; and

    e. Any other relief authorized and that is Court deems just and equitable.

### DEMAND FOR TRIAL BY JURY

Dr. Preckel demands a trial by jury in this action on all causes in this Lawsuit.

Respectfully Submitted,

_____/s/_____
Ruth Ann Azeredo (16175)
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, MD  21401
(410) 558-1915
(410) 558-1917 Fax
ruthazeredo@comcast.net

and

_____/s/_____
Timothy W. Romberger
Fed. Bar No. 014408
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C. 20046
(202) 248-5053
(703) 582-6494
Timromberger1@comcast.net

DATE:  December 23, 2020